UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VOLUNTEER ENERGY SERVICES, INC.,


        Plaintiff,

                                    File No.  1:11-CV-554

v.

                                    HON. ROBERT HOLMES BELL

OPTION ENERGY, LLC, et al.,

        Defendants.

_____/

**O P I N I O N**

This matter is before the Court on a motion for preliminary injunction filed by

Plaintiff Volunteer Energy Services, Inc. ("Volunteer Energy") (Dkt. No. 12), and a motion

to dissolve temporary restraining order and to dismiss Plaintiff's motion for preliminary

injunction filed by Defendants Option Energy, LLC, ("Option Energy"), Jonathan

Rockwood, and Ivan Pillars (Dkt. No. 15).  For the reasons that follow, Defendants' motion

will be denied and Plaintiff's motion will be granted in part and denied in part.

**I.**

The Court turns first to Defendants' motion to dissolve the temporary restraining order

and to dismiss Plaintiff's motion for preliminary injunction.  Defendants contend that

Plaintiff is barred by collateral estoppel from attempting to re-litigate issues previously

determined by the state court.

The relevant facts concerning this motion are not in dispute.  On March 30, 2011,

Volunteer Energy filed an action for injunctive relief and damages against Option Energy

LLC in the Kalamazoo County Circuit Court, *Volunteer Energy Serv., Inc. v. Option Energy,*

*LLC*, No. 11-0157-CZ (Kalamazoo Cir. Ct.).  The state denied Volunteer Energy's motion

for preliminary injunction.  Volunteer Energy dismissed the state court action without

prejudice prior to the filing of an answer and instituted this federal action.  This Court

granted Volunteer Energy's motion for temporary restraining order and scheduled a hearing

on Volunteer Energy's motion for preliminary injunction.

In response to Defendants' motion to dismiss, Volunteer Energy contends that the

prior state court ruling does not bar its motion for preliminary injunction because the state

court action was dismissed before there was a final judgment, and collateral estoppel only

applies where there has been a final judgment on the merits.  *See People v. Gates*, 434 Mich.

146, 154-55, 452 N.W.2d 627 (1990) ("Collateral estoppel precludes relitigation of an issue

in a subsequent, different cause of action between the same parties where the prior

proceeding culminated in a valid, final judgment and the issue was (1) actually litigated, and

(2) necessarily determined.").

Defendants contend that an order denying injunctive relief is a "final judgment" for

purposes of collateral estoppel because the time for filing an appeal from the denial of

injunctive relief has passed.  *See Leahy v. Orion Twp.*, 269 Mich. App. 527, 530, 711 N.W.2d

438 (2006) ("A decision is final when all appeals have been exhausted or when the time

available for an appeal has passed.").

2

Neither party has cited any Michigan or Sixth Circuit law directly addressing whether collateral estoppel precludes a party from making a second attempt at a preliminary injunction in a different court. However, there is federal case law from outside the circuit that discusses when a preliminary injunction is a final judgment for purposes of issue preclusion:

> In general, rulings in connection with grants or denials of preliminary relief will not be given preclusive effect. Such rulings are often made on an incomplete record and are inherently tentative in nature. Usually, the grant or denial of relief is based not on a conclusive determination, but on an estimate of the likelihood of success.

*Abbott Laboratories v. Andrx Pharm., Inc*., 473 F.3d 1196, 1205 (Fed. Cir. 2007) (quoting *A.J. Canfield Co. v. Vess Beverages, Inc*., 859 F.2d 36, 38 (7th Cir. 1988)). Only in "certain rare circumstances," will a decision on a preliminary injunction motion be given preclusive effect. *Id*. This exception applies to a decision that constitutes an "insuperable obstacle" to the plaintiff's success on the merits, such as a decision that is "clearly intended to firmly and finally resolve the issue," rather than "estimate the likelihood of success" of proving that issue. *Id*. at 1205-06. In *Avitia v. Metropolitan Club of Chicago, Inc*., 924 F.2d 689 (7th Cir. 1991), cited by Defendants, the Seventh Circuit held that collateral estoppel precluded the plaintiffs from challenging the district court's second denial of the plaintiffs' request for injunctive relief because the plaintiffs had never appealed the first denial. *Id*. at 691. The district court had denied injunctive relief because "only the Secretary of Labor may pursue injunctive remedies" for violations of the Fair Labor Standards Act ("FLSA"). *Id*. at 690. The application of the doctrine of collateral estoppel by the Seventh Circuit is consistent with

3

*Abbott Laboratories* because the district court in *Avitia* had essentially found that there was an "insuperable obstacle" to the plaintiffs' success.

In this case, the state court's decision to deny Volunteer Energy's motion for preliminary injunction was made on an incomplete record based on tentative determinations regarding the public interest and the plaintiff's likelihood of success on the merits. (Dkt. No. 15, Ex. D, State Ct. Tr. 20-21.) The decision was not based on an "insuperable obstacle" to Volunteer Energy's success on the merits. Accordingly, the state court's decision on the motion for preliminary injunctive relief is not entitled to preclusive effect.

Although it does not appear that the law precludes Plaintiff from dismissing the state court action without prejudice and refiling its action in federal court, the Court is nevertheless troubled by Plaintiff's blatant forum shopping. Parties who engage in forum shopping may be subject to the imposition of costs under Rule 41(d) of the Federal Rules of Civil Procedure which provides:

> Costs of a Previously Dismissed Action. If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court:
> (1) may order the plaintiff to pay all or part of the costs of that previous action; and
> (2) may stay the proceedings until the plaintiff has complied.

Fed. R. Civ. P. 41(d).

> Rule 41(d) is meant not only to prevent vexatious litigation, but also to prevent forum shopping, "especially by plaintiffs who have suffered setbacks in one court and dismiss to try their luck somewhere else." Hence, Rule 41(d) is also intended to prevent attempts to "gain any tactical advantage by dismissing and refiling th[e] suit."

*Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 874 (6th Cir. 2000) (citations omitted).

Plaintiff's dismissal of its state court action after denial of its motion for preliminary

injunction, and its refiling of the same action in this court is a clear case of forum shopping.

Therefore, the Court will require Plaintiff to pay all of the costs incurred by Defendants in

defending the previous action that Plaintiff intentionally aborted before coming to federal

court.

In response to the Court's indication that it was inclined to order costs pursuant to

Rule 41(d), Plaintiff has presented a notice of costs paid pursuant to Rule 41(d).  (Dkt. No.

22, Notice of Costs Paid.)  Plaintiff asserts that because the Sixth Circuit has held that costs

recoverable under Rule 41(d) do not include attorney fees, the only costs stemming from the

earlier filed state court action are those assessed by the state court, and Plaintiff has paid

these costs in full.  (*Id.*)

Although the majority of courts find that attorney fees are available under Rule 41(d),

the Court is bound by the Sixth Circuit's determination that attorney fees are not available

under this rule. *See Rogers*, 230 F.3d at 874.  If Defendants incurred recoverable costs in the

state court action and wish to recover those costs, they may file notice of their costs within

fourteen (14) days of this order.

## II.

The Court turns to Plaintiff's motion for a preliminary injunction enjoining Option

Energy from soliciting Volunteer Energy's customers on behalf of competing alternative gas

suppliers. A hearing was held on June 21, 2011, at which time the Court took testimony from

Plaintiff's representative, Shawn K. Hall.  Defendants did not present any evidence.  Based

upon the evidence received in open court and the affidavits attached to the parties' briefs, the

Court makes the following findings of fact and conclusions of law.

## A.  Background

Plaintiff Volunteer Energy is an Ohio corporation licensed in Michigan as an

Alternative Gas Supplier.  Volunteer Energy supplies gas to utility companies, and the utility

companies deliver and bill customers of Volunteer Energy for the gas.  Mr. Hall began

working at Volunteer Energy five years ago as an agent and is now the Regional Manager

for Michigan.  As Regional Manager he is responsible for hiring and managing agents for

Volunteer Energy.  Volunteer Energy has 75-80 agents in Michigan who are responsible for

soliciting customers on behalf of Volunteer Energy.  All of the agents have signed Agent

Agreements.

Defendant Option Energy is an alternative energy broker doing business in Michigan

and throughout the United States.  Option Energy acts as a broker between alternative energy

suppliers and consumers of those energy services.  Option Energy facilitates the switching

of customers from local utility services to alternative energy suppliers.  Option Energy does

not act exclusively on behalf of any particular supplier.

On February 2, 2009, Volunteer Energy (a/k/a "VESI") entered into an Agent

Agreement with Option Energy. John Rockwood, the President and CEO of Option Energy,

interviewed with Mr. Hall about becoming an agent for Volunteer Energy. Mr. Rockwood

reviewed the Agent Agreement prior to signing it and expressed no concerns about the non-

solicitation provision. Option Energy agreed to be an agent for Volunteer Energy and to

"exert its best efforts to promote the sale of natural gas by Volunteer Energy to new

customers in the Territory." (Agrm't § 4(a).) In return, Volunteer Energy agreed to pay

Option Energy a commission for as long as Volunteer Energy supplies natural gas to Agent

Customers. (Agrm't § 3.) "Agent Customers" is defined as "those end-user persons,

consumers or entities, solicited solely by Agent, with whom or which Agent has entered (or

has caused VESI to enter) into a natural gas supply contract or nomination with respect to

a specific facility location." (Agrm't § 1.) The Agent's rights to solicit customers are non-

exclusive, "it being expressly understood that VESI, in its sole discretion, shall have the right

to employ sales representatives and/or enter into independent contractor agreements with

others in the Territory." (Agrm't § 2(b).) The Agent Agreement contains a Non-Solicitation

clause which provides in pertinent part:

> **For the term of this Agreement** and for the longer of (a) one year after the
> Termination Date (defined below) or (b) to Agent following termination, as set
> forth in Section 10, **Agent agrees that it will not** . . . (2) **solicit existing
> customers at the time of the termination date of VESI** (including those of
> VESI's affiliates) in the Territory **regarding the purchase of natural gas by
> any such customer**.

(Agrm't § 8 (emphasis added).)

When Option Energy contracted with Volunteer Energy, Volunteer Energy was

Option Energy's only supplier. However, it was understood that Option Energy would not

be acting exclusively on behalf Volunteer Energy.  (Rockwood Aff. § 7.)  After the contract

was entered into, Option Energy began working for other suppliers.  The Agent Agreement

did not prohibit Option Energy from working with other suppliers.  In November 2010, Mr.

Rockwood asked Volunteer Energy if he could move some Volunteer Energy customers to

another supplier.  Mr. Hall explained that the Agent Agreement's non-solicitation provision

did not allow agents to solicit Volunteer Energy customers for other suppliers, but he agreed

to allow Option Energy to move twelve accounts.

In early 2011 Volunteer Energy noticed a sharp increase in customers acquired

through Option Energy who were terminating their relationships with Volunteer Energy.

Volunteer Energy contacted several former customers and repeatedly heard that Option

Energy had contacted them to encourage them to switch to a competing alternative gas

supplier that provided better rates and service.   The Volunteer Energy customers who

advised that they had been solicited by Option Energy to move to competing alternative gas

suppliers included both customers acquired through Option Energy's efforts as well as

customers Volunteer Energy acquired without Option Energy's involvement. For example,

the Kalamazoo Country Club, which was a Volunteer Energy customer before Option Energy

became an agent, advised that it had been approached by Ivan Pillars of Option Energy, who

had encouraged the Kalamazoo Country Club to terminate its relationship with Volunteer

Energy and switch to a competing alternative gas supplier.

Option Energy has presented evidence that many of its Agent Customers (i.e.,

Volunteer Energy customers solicited solely by Option Energy) have complained about Volunteer Energy. (Rockwood Aff. § 16.) Option Energy denies that it ever "contacted or solicited any person for the express purpose of convincing that person to cease doing business with Volunteer." (Rockwood Aff. § 17.) However, Option Energy has presented evidence which appears to confirm that Option Energy has contacted its Agent Customers at Volunteer Energy about alternative pricing options, and has assisted them in moving to alternative gas suppliers. (Vandenboss Aff. §§ 6-9.) In addition, Option Energy has presented evidence that its customers expect it to notify them if Option Energy becomes aware of any further cost savings that customers can take advantage of. (Rockwood Aff. § 4.)

By letter dated April 1, 2011, Option Energy gave notice under section 9(b) of the Agent Agreement that Volunteer Energy was in material default of the Agreement for a number of reasons, including its failure to pay commissions as they became due. (Rockwood Aff. Ex. 3.) Section 9(b) of the Agent Agreement provides that if a party is in material default and does not cure the default within twenty days after written notice, the non-defaulting party may immediately terminate the agreement upon written notice. There is no evidence that Option Energy provided written notice of its intent to terminate the Agent Agreement at the conclusion of the twenty-day period. Section 9(a) provides that the Agent Agreement may also be terminated by either party for any reason on 60 days notice. There is no evidence that either party has provided written notice of its intent to terminate the Agent Agreement under section 9(a).

**B. Analysis**

Plaintiff contends that Defendants have violated the non-solicitation provision of the

Agent Agreement and seeks a preliminary injunction prohibiting Defendants from soliciting

Volunteer Energy's customers on behalf of competing alternative gas suppliers.

The Agent Agreement provides for enforcement of the non-solicitation provision by

injunctive relief:

> In the event of breach of the foregoing non-solicitation and non-competition
> covenants and agreements, it is expressly agreed that VESI shall, in addition
> to all other rights and remedies, be entitled to injunctive relief.

(Agrm't § 8.)

The Agent Agreement is governed by Ohio law.  (Agrm't § 14.)  However, in a

diversity action such as this, the Court applies federal procedural jurisprudence regarding the

factors to consider in granting a preliminary injunction.  *Certified Restoration Dry Cleaning*

*Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007).  The factors the Court

considers are:

> (1) whether the movant has a strong likelihood of success on the merits; (2)
> whether the movant would suffer irreparable injury without the injunction; (3)
> whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the
> injunction.

*Id.* at 542 (quoting *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).

1.  Likelihood of Success on the Merits

Volunteer Energy contends that it has a strong likelihood of success on the merits of

its claim that Option Energy violated the non-solicitation provision of the Agent Agreement

by soliciting Volunteer Energy customers on behalf of competing alternative gas suppliers. In their response, Defendants focused less on Plaintiff's factual assertions concerning Defendants' actions, and more on the construction of the non-solicitation provision. Defendants contend that the non-solicitation provision does not apply to Option Energy's "Agent Customers."

The non-solicitation provision is inartfully drafted. It provides that "for the term of the Agreement," the Agent agrees that it will not "solicit existing customers at the time of the termination date of VESI" regarding the purchase of natural gas by any such customer. (Agrm't § 8 (emphasis added).) The simultaneous references to "the term of the Agreement," "existing," and "the termination date of VESI" are certainly unclear. Yet, this ambiguity is not the basis for Defendants' argument. Defendants contend instead that the non-solicitation provision does not apply to them because it only applies to "existing customers" rather than to "Agent Customers." According to Defendants, the Agent Agreement sets up two classes of customers – Agent Customers, and all other customers of Volunteer Energy – and the non-solicitation provision only applies to all other customers of Volunteer Energy.

Defendants' construction of the non-solicitation provision is not persuasive. The term "customer" is not defined in the Agent Agreement, so it must be given its ordinary meaning. *See State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915-16 (Ohio 2004) ("[C]ommon, undefined words appearing in a written instrument 'will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from

11

the face or overall contents of the instrument.'"). The ordinary meaning of "customer" as it appears in the Agent Agreement includes all entities with whom Volunteer Energy has a contractual relationship for the supply of natural gas.[1]

The Agent Agreement specifically defines "Agent Customers" because "Agent Customers" are the basis for calculating the Agent's commission: "Agent will be paid commissions on the sales of natural gas to Agent Customers at a commission rate of $0.10 per Mcf ($.10 per Ccf) sold for the term of this Agreement." (Agrm't § 3(a).) Agent Customers are a subset of Volunteer Energy's customers. Accordingly, the non-solicitation provision's prohibition against Agents from soliciting "customers" as opposed to "Agent Customers," applies to all customers of Volunteer Energy, including Agent Customers.

Defendants contend that if the non-solicitation provision is construed to bar them from communicating with Agent Customers, it would be unreasonable and unenforceable under Ohio law because the Agent Customers are their own clients, who were generated solely through Option Energy's efforts, without any assistance from Volunteer Energy. Defendants contend this case is analogous to *HCCT v. Walters*, 651 N.E.2d 25 (Ohio App. 1994), where the court held that a non-solicitation/non-compete provision agreement was unreasonable and unenforceable against a hair stylist where the former employer had not invested time or

---

[1] *See, e.g.*, § 2(a) ("Agent will have the right to solicit customers for New Contracts and Renewal Contracts in the Territory for sales of natural gas by VESI."); § 3(c) "In the event of a good faith dispute between Agent and any other agent of VESI as to entitlement to a commission for a specific customer, VESI's shall have the authority to determine which agent shall be credited with that account."); § 4(a) ("Agent shall exert its best efforts to promote the sale of natural gas by VESI to new customers in the Territory.").

money in training the hair stylist, and this was the hair stylist's sole means of support. *Id.* at 27.

Ohio courts will enforce restrictive covenants that are reasonable in scope. *See Lake Land Emp. Group of Akron, LLC v. Columber*, 804 N.E.2d 27, 30 (Ohio 2004). A restriction is reasonable if it is "no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975). The non-solicitation provision at issue is reasonable as to time and scope. It only prevents Option Energy from soliciting Volunteer Energy's customers during the contract and for one year after the termination of the contract. It is distinguishable from the provision at issue in *Walters* because it does not prohibit Option Energy from engaging in its livelihood. It does not prohibit Option Energy from soliciting customers for alternative energy suppliers. It only prohibits Option Energy from soliciting customers who have signed with Volunteer Energy.

Based upon the Court's construction of the Agent Agreement and Option Energy's apparent acknowledgement that it has provided alternative pricing to Volunteer Energy customers and has moved Volunteer Energy customers to alternative gas suppliers, the Court finds that Volunteer Energy has a likelihood of success on the merits of its claim that Option Energy breached the non-solicitation provision in the Agent Agreement.

2. Irreparable Harm to Volunteer Energy

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty.*

*Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

Volunteer Energy has presented evidence that in the last 6 months, 341 account holders have terminated their contracts, representing approximately $436,000 of lost net revenue to Volunteer Energy.   (Hall Aff. ¶ 8.)  Volunteer Energy contends that Option Energy's continued breach of the Agreement will result in irreparable harm from the loss of customers, damage to its business reputation, and loss of its customers' trust.

Defendants contend that Volunteer Energy will suffer no irreparable harm in the absence of the requested injunction because its only losses are pecuniary in nature. Defendants contend that Volunteer Energy does not have any legitimate claim of losing "customer relationships" and "customer goodwill" because the customers were originally found due to Option Energy's sole efforts, and Volunteer Energy has other agents who can access these customers.

Although the evidence supports Option Energy's claim that it obtained customers for Volunteer Energy without any significant assistance from Volunteer Energy, once those customers became Volunteer Energy customers, the Court is satisfied that Volunteer Energy developed a relationship with them that could be irreparably harmed in the absence of the requested injunction.

3. Harm to Option Energy

Volunteer Energy contends that the requested injunction will not cause substantial harm to Option Energy because it will not prevent Option Energy from operating as an

energy broker in the same geographic area in which Volunteer Energy provides services.

Moreover, Plaintiff contends that Option Energy will continue to receive commissions on its

Agent Customers, even after termination of the Agent Agreement, in accordance with section

10 of the Agreement.[2]

Defendants contend that they will be harmed by the requested injunction because it

will prevent them from communicating with the client base Option Energy developed

through its own efforts.   Defendants have presented evidence that their customers expect

Option Energy to continue to advise them as to the best alternative energy deals available,

regardless of who currently provides their service.  (Rockwood Aff. § 4; Vandenboss Aff.

¶¶  8.)

Although an injunction may have a negative impact on Defendants' relationships with

their current client base, the Court finds that this harm should have been anticipated when

---

[2]Section 10 of the Agent Agreement provides that:

On and after the Termination Date, Agent will continue to be paid
commissions in full: (1) on orders solicited by Agent prior to the Termination
Date and accepted by the Company as New or Renewal Contracts within three
(3) months after the Termination Date; and (2) on sales of natural gas to
Agent's Customers for the remaining term of the New or Renewal Contracts
or renewals thereof; and that VESI shall not be obligated to pay any
commission to Agent with respect to New or Renewal Contracts after forty-
eight (48) months from the Termination Date even if the term of any such New
or Renewal Contracts extends beyond that date.   Notwithstanding the
preceding sentence, should there be a Termination for Cause due to Agent's
material breach of this Agreement, the commissions payable to Agent shall
cease twelve (12) months after the Termination Date.

(Agrm't § 10.)

Option Energy entered into an Agent Agreement that included a non-solicitation provision.

4.  Public Interest

Volunteer Energy contends that an injunction will promote the public interest by upholding the sanctity of agreement, ensuring that a business's confidential information is protected, and ensuring vigorous and fair business competition.  Defendants contend that the requested injunction is contrary to the public's interest in encouraging competition in the marketplace.

Entry of the requested injunction will not discourage competition.  It will not prevent Volunteer Energy's customers from shopping around for a lower rate, nor will it prevent Option Energy from competing for customers who have not yet signed with Volunteer Energy.

Having considered and balanced the relevant factors, the Court concludes that the equities support entry of a preliminary injunction prohibiting Defendants from soliciting any customers of Volunteer Energy until this matter can be heard in full.

An order consistent with this opinion will be entered.


Dated: July 29, 2011                                    /s/ Robert Holmes Bell
                                                        ROBERT HOLMES BELL
                                                        UNITED STATES DISTRICT JUDGE