UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VOLUNTEER ENERGY SERVICES, INC.,

       Plaintiff,

                                 File No.  1:11-CV-554

v.

                                 HON. ROBERT HOLMES BELL

OPTION ENERGY, LLC, et al.,

       Defendants.

_____/

## O P I N I O N

This diversity breach of contract action is before the Court on the parties' cross-motions for summary judgment.  (Dkt. Nos. 93, 100.)  For the reasons that follow, the motions will be granted in part and denied in part.

### I.

Plaintiff Volunteer Energy Services, Inc. ("Volunteer" or "VESI") is an Ohio corporation licensed as an Alternative Gas Supplier in the State of Michigan, and with offices in Northville, Michigan.

Defendant Option Energy, LLC ("Option") is a Michigan limited liability company with an office in Kalamazoo, Michigan.  (Answ. to Am. Compl. ¶ 2.)  Defendant Jonathan Rockwood is President and Chief Executive Officer of Option.  (Dkt. No. 100, Rockwood Aff. ¶ 1.)

On February 2, 2009, Volunteer entered into an Agent Agreement with Option.

Option agreed to be an agent for Volunteer Energy and to "exert its best efforts to promote the sale of natural gas by Volunteer Energy to new customers in the Territory." (Agrm't § 4(a).) In return, Volunteer agreed to pay Option a commission for as long as Volunteer supplies natural gas to Agent Customers. (Agrm't § 3.) The Agent's rights to solicit customers are non-exclusive, "it being expressly understood that VESI, in its sole discretion, shall have the right to employ sales representatives and/or enter into independent contractor agreements with others in the Territory." (Agrm't § 2(b).) The Agent Agreement permitted either party to terminate the agreement on 60 days prior written notice, or immediately if either party was in material default and failed to cure the default within 20 days after receiving written notice. (Agent Agrm't ¶ 9.) The Agent Agreement was signed by Shawn Hall on behalf of Volunteer, and by Jonathan Rockwood on behalf of Option.

The Agent Agreement contains a Non-Solicitation/Non-Competition clause which provides in pertinent part:

> **For the term of this Agreement and** for the longer of (a) **one year after the Termination Date** (defined below) or (b) to Agent following termination, as set forth in Section 10, **Agent agrees that it will not** (1) employ any VESI employee without VESI's prior written consent or solicit or attempt to induce any VESI employee to become its employee or the employee of any VESI competitor or customer; and/or (2) **solicit existing customers at the time of the termination date of VESI** (including those of VESI's affiliates) in the Territory regarding the purchase of natural gas by any such customer.

(Agrm't § 8 (emphasis added).)

In April 2010, Rockwood contacted Hall to request permission to switch 12 Volunteer customers to an alternative gas supplier. Hall consented to Rockwood's request to switch

2

12 accounts, but limited the number to 12, and advised Rockwood to review the conditions

of his Agent agreement as any violations may result in termination and or legal action.

(Rockwood Dep., Ex. 3.)   Between April 2010 and May 2011, Option continued to switch

Volunteer customers to an alternative gas supplier without advising Volunteer.

By letter dated April 1, 2011, Option terminated the Agent Agreement effective April

21, 2011, based on its assertion that Volunteer had breached the Agreement by, among other

things, failing to pay commissions, and failing to provide rates and marketing materials.

(Dkt. No. 100, Ex. F.)

On May 27, 2011, Volunteer filed this action for breach of contract against Option

(Count I) and tortious interference with a business relationship against Option, Rockwood,

and Pillars (Counts II, III, IV) based on Defendants' active solicitation of Volunteer customer

accounts for a competitor.  (Dkt. No. 10, Am. Compl.)  Option filed a counterclaim against

Volunteer, alleging breach of contract for failing to pay commissions and failing to provide

information about customers recruited by Option (Count I), violation of the Michigan Sales

Representative Act, Mich. Comp. Laws  § 600.2961 (Count II), and unjust enrichment

(Count III).  (Dkt. No. 27, CounterCl.)

On July 29, 2011, this Court entered an order preliminarily enjoining Defendants from

"soliciting or attempting to solicit any customer who receives natural gas from Volunteer

Energy until further order of this Court." (Dkt. No. 25.)  The parties have filed cross-motions

for summary judgment.

## II.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.

The parties have filed cross-motions for summary judgment on the issue of whether Option breached the Agent Agreement. Volunteer contends that Option breached the Agreement when it solicited customers to transfer to other natural gas suppliers. There is no question of fact that Defendants solicited Agent Customers on behalf of other natural gas

suppliers.[1]  Option contends, however, that it did not breach the Agreement because the non-solicitation clause only applies following termination of the Agreement, and only applies to non-Agent Customers.  The parties' cross-motions for summary judgment raise an issue of contract interpretation: did the non-solicitation clause prohibit Option's solicitation of Agent Customers while the Agent Agreement was in effect?

The Agent Agreement is governed by Ohio law.  (Agrm't § 14.)  The Court's primary role in construing the terms of a contract is "to ascertain and give effect to the intent of the parties."  *Saunders v. Mortensen*, 801 N.E.2d 452, 454 (Ohio 2004) (citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos*., 714 N.E.2d 898 (1999)).  "[A] contract is to be read as a whole and the intent of each part gathered from a consideration of the whole."  *Saunders*, 801 N.E.2d at 454.  "If it is reasonable to do so, [the court] must give effect to each provision of the contract."  *Saunders*, 801 N.E.2d at 454.  "Contract terms are to be given their plain and ordinary meaning."  *Lager v. Miller–Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008).  "When the language of the written instrument is clear and unambiguous, the interpretation of the instrument is a matter of law, and the court must determine the intent of the parties through the language employed."  *LCP Holding Co. v. Taylor*, 817 N.E.2d 439, 444-45 (Ohio Ct. App. 2004).  "However, if the contract is ambiguous, ascertaining the parties' intent constitutes a question of fact."  *7 Med. Sys., L.L.C. v. Open MRI of Steubenville*, 2012 WL

---

[1]Option does not deny transferring customers from Volunteer to other suppliers during the term of the Agent Agreement.  (Dkt. No. 100, Def. Br. 7; Dkt. No. 110, Def. Br. 6.)

2522646, 3 (Ohio Ct. App. 2012).

**A. Does the Non-Solicitation provision apply during the term of the Agent Agreement?**

The non-solicitation clause provides that "for the term of the Agreement," the Agent agrees that it will not "solicit existing customers at the time of the termination date of VESI" regarding the purchase of natural gas by any such customer. (Agrm't § 8.) Volunteer contends that the clause means that during the term of the Agreement and for one year thereafter, Option may not solicit Volunteer customers. Defendants contend that because any customer solicited or transferred to another gas supplier during the term of the agreement would, by definition, not be an existing customer at the time of termination, the clause means that the prohibition on soliciting Volunteer customers becomes effective only after termination of the Agent Agreement.

A contract is ambiguous when a provision is susceptible of more than one reasonable interpretation. *Lager*, 896 N.E.2d at 669. Because of the Agreement's simultaneous references to "the term of the Agreement," and "the termination date of VESI," it is unclear whether the non-solicitation provision applies during the life of the Agreement, or whether it only springs into being upon termination of the Agreement. If the Court construes the provision to preclude an Agent from soliciting "existing customers at the time of the termination date," the Court would have to ignore the introductory language "[f]or the term of this Agreement." If the Court construes the provision to preclude an Agent from soliciting

6

existing customers for the term of the Agreement, the Court would have to ignore the language "at the time of the termination date." The Court finds, as a matter of law, that the non-solicitation clause is ambiguous. *See Ohio Historical Soc. v. Gen. Maintenance & Eng. Co.*, 583 N.E.2d 340, 344 (1989) ("The decision as to whether a contract is ambiguous and thus requires extrinsic evidence to ascertain its meaning is one of law."). "[W]here a contract is ambiguous, parol evidence may be employed to resolve the ambiguity and ascertain the intention of the parties." *Ill. Controls, Inc. v. Langham*, 639 N.E.2d 771, 779 (Ohio 1994).

Volunteer contends that both parties understood that the non-solicitation clause precluded Option from soliciting Volunteer customers during the term of the Agreement. In support of this contention, Volunteer points to evidence that Rockwood sought permission from Volunteer before moving customers to another gas supplier, and Rockwood did not express any disagreement when Hall advised that he could only move twelve customers. In addition, Volunteer has produced evidence that Option's independent contractors understood that while they could sign non-Volunteer customers with Integrys (Dkt. No. 93, Pl. Ex. F(3), McDaniel 4/7/10 email), Option's agreement with Volunteer "states we (OE) should not steer former (Volunteer) clients away to other suppliers." (Dkt. No. 93, Pl. Ex. F(5), Schmiege 9/2/10 email).

Option has presented evidence that it never shared Volunteer's construction of the non-solicitation clause. Rockwood stated in his affidavit: "I did not agree with Mr. Hall's or Volunteer's interpretation of the Agreement and at no time did this interpretation of the

Agreement given by Volunteer deter or preclude Option Energy from switching customers to a different gas supplier when that was in our customer's best interest." (Dkt. No. 100, Ex. C, Rockwood Aff. ¶ 12 ). Defendants contend that Option only notified Volunteer about switching customers as a courtesy.

The non-solicitation clause itself is ambiguous, and there is a question of fact as to whether there was a meeting of the minds with respect to when the non-solicitation clause was to take effect.  The Court is accordingly precluded from granting summary judgment on the issue of when the non-solicitation clause took effect.  *See United Ohio Ins. Co. v. Brooks*, No. 12-11-04, 2012 WL 1099821, at *4 (Ohio App. Apr. 2, 2012) (noting that when a contract is ambiguous, "[i]t is generally the role of the finder of fact to resolve ambiguity.").

**B.  Does the Non-Solicitation provision apply to "Agent Customers"?**

Even if there is a question of fact as to whether the non-solicitation clause applies during the term of the Agreement, Option contends that it is nevertheless entitled to summary judgment because the non-solicitation clause did not preclude Option from transferring Agent Customers either prior to or after termination.

The Agent Agreement defines "Agent Customers" as:

[T]ose end-user persons, consumers or entities, solicited solely by Agent, with whom or which Agent has entered (or has caused VESI to enter) into a natural gas supply contract or nomination with respect to a specific facility location. The term "Agent Customers" shall not include any persons or entities with whom VESI had a contractual relationship, whether such action or relationship was within the Territory, as defined hereinafter, or otherwise prior to the date of this Agreement.

(Agrm't ¶ 1.)

The non-solicitation clause refers to "customers,"[2] a term that is not defined in the Agent Agreement.  Option contends that the Agent Agreement sets up two classes of customers – Agent Customers, and all other customers of Volunteer Energy.  According to Option, the non-solicitation clause does not apply to Agent Customers; it only applies to all other customers of Volunteer.

Because the term "customer" is not defined in the Agent Agreement, it must be given its ordinary meaning. *See State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915-16 (Ohio 2004) ("[C]ommon, undefined words appearing in a written instrument 'will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument.'").  The ordinary meaning of customer is "one that purchases a commodity or service."  Merriam-Webster Unabridged Dictionary, www.merriam-webster.com.  The ordinary meaning of "customer" as it appears in the Agent Agreement clearly includes all customers of Volunteer Energy, i.e., all entities that purchase gas from Volunteer.  There is no ambiguity in the meaning of the term "customers" as it is used in the Agent Agreement.  Agent Customers are the Volunteer customers that were solicited by Option.  Agent Customers are a subset of Volunteer's

---

[2]"For the term of this Agreement and for . . . one year after the Termination Date . . . Agent agrees that it will not . . . solicit existing customers at the time of the termination date of VESI (including those of VESI's affiliates) in the Territory regarding the purchase of natural gas by any such customer."  (Agrm't § 8.)

customers.[3]  Accordingly, the non-solicitation clause's prohibition against Agents soliciting "customers" applies to all customers of Volunteer Energy, including Agent Customers.

## C.  Is the Restriction Reasonable?

Defendants contend that if the non-solicitation provision is interpreted to prohibit Option from soliciting any individual or business once they have signed up with Volunteer for the term of the Agent Agreement and for one year following its termination, the clause is unenforceable as an unreasonable restraint of competition.

"Restrictive covenants not to compete are disfavored by law." *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 706 N.E.2d 336, 340 (Ohio Ct. App. 1997).  "However, such restrictive covenants are not per se unenforceable and if reasonable may be enforced by injunctive relief." *Id.*  "For a restraint to be reasonable, it must be no greater than necessary to protect the legitimate interests of the person or entity of whom the restraint is in favor, must not impose an undue hardship on the person or entity upon whom the restraint is imposed, and must not be injurious to the public." *Id.* (citing *Raimonde v. Van Vlerah*, 42 325 N.E.2d 544, 547 (1975).  "The reasonableness of the restraint must be decided on its own facts and is tested by the totality of the circumstances." *Id.*  Under Ohio law, even if a

---

[3]Option contends that the Agent Agreement should be interpreted in accordance with Option's practice of acting on behalf of the customers it solicits.  Option refers the Court to its agreement with Integrys as the best outline of Options' relationship with its clients: i.e., that Option "shall place the interest of the Prospect/Customer before those of the Supplier." (Dkt. No. 110, Def. Br. 14; Dkt. No. 83, Rockwood Dep., Ex. 5, ¶ 3(a).)  This provision is not found in the Volunteer agreement, and because the term "customer" as used in the Volunteer agreement is not ambiguous, the Court may not go outside the Agreement to determine the parties' intent.

10

restrictive covenant imposes unreasonable restrictions, the covenant will still be enforced to the extent necessary to protect the employer's legitimate interests. *Raimonde*, 325 N.E.2d at 547.

Viewing the evidence in the light most favorable to Volunteer, the non-moving party on this issue, the Court cannot find, as a matter of law, that the non-solicitation clause is unreasonable. There are questions of fact concerning the meaning of the non-solicitation clause, as well as the legitimate interests of Volunteer and the degree of hardship on Option that preclude the Court from ruling on this issue on summary judgment.

Accordingly, the Court will deny the parties' cross-motions for summary judgment on the breach of contract claim, except that the Court will grant Volunteer's motion to the extent it requests a ruling that the non-solicitation clause's prohibition against Agents soliciting "customers" applies to all customers of Volunteer Energy, including Agent Customers.

## IV.

The cross-motions for summary judgment also address Volunteer's tortious interference with business relationship claims against Option, Rockwood, and Pillars. The parties agree that these claims are governed by Michigan law. Under Michigan law, a claim of tortious interference with business relationship requires:

> (1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship or expectancy; and (4) resulting damage to the plaintiff.

11

*Warrior Sports, Inc. v. NCAA*, 623 F.3d 281, 286 (6th Cir. 2010) (citing *Via The Web Designs, L.L.C. v. Beauticontrol Cosmetics, Inc.*, 148 F. App'x 483, 487 (6th Cir. 2005)). "'The third element of this tort requires the plaintiff to demonstrate . . . an intentional act that is either (1) wrongful per se; or (2) lawful, but done with malice and unjustified in law.'" *Id.* (quoting *Via The Web Designs*, 148 F. App'x at 487). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Erickson's Flooring & Supply Co., Inc. v. Tembec, Inc.*, 212 F. App'x 558, 566 (6th Cir. 2007) (quoting *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 661 N.W.2d 586, 597-98 (2003)).

Defendants move for summary judgment in their favor on Volunteer's tortious interference claims.  Defendants contend that because the claims are based on Defendants' alleged breach of the non-solicitation clause, and because there was no breach of any contractual obligation, the tortious interference claims fail as well.  This Court has determined in Part III above that there are questions of fact for trial regarding the alleged breach of the non-solicitation clause.  Accordingly, Defendants are not entitled to summary judgment under this theory.  There are questions of fact for trial as to whether Defendants' actions were justified under Option's contractual arrangement with Volunteer.

Defendants alternatively move for summary judgment on the tortious interference claim against the individual Defendants.  Defendants contend that Rockwood is insulated from personal liability because all of the transfers were in the legitimate business interests

of Option, and because there is no evidence that Rockwood acted other than in his capacity as an officer of Option. *See Bradley v. Philip Morris Inc*., 194 Mich. App. 44, 50-51 (1991) ("[T]he defendant who is a corporate officer or agent is liable for tortious interference only if he acted for his own benefit with no benefit to the corporation."); *see also Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 800 (6th Cir. 2007) (affirming summary judgment for majority shareholder, because, for purposes of a tortious interference with contract action, the majority shareholder and the corporation were the same party, and the majority shareholder could not, as a matter of law, commit the tort at issue); *Reed v. Mich. Metro Girl Scout Council*, 201 Mich. App. 10, 506 N.W.2d 231, 233 (1993) (per curiam) ("[C]orporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation.").

Defendants' reliance on *Bradley* and its progeny is misplaced. There is also an established line of authority that a corporate officer or agent is personally liable for the torts committed by him even though he was acting for the benefit of the corporation. *See Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.,* 821 F. Supp. 1201, 1213 (E.D. Mich. 1993) (citing authorities). *Lifeline* reconciled the two lines of authority by noting that the *Bradley* line of cases involved the issue of whether an officer of a corporation could be held liable for interfering with a contract between his own employer and a third party. The *Bradley* line of cases is distinguishable because Volunteer is not asserting that the individual defendants interfered with their own employer's (Option's) contract, but with the business relationships

13

of a third party, Volunteer. Under Michigan law, a corporate officer or agent may be held personally liable for his interference with the business relations of a third party. *See*, *e.g.*, *A & M Records, Inc. v. M.V.C. Distrib. Corp.*, 574 F.2d 312, 315 (6th Cir. 1978) ("It is well established that a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation." (construing Michigan law); *Joy Mgmt. Co. v. City of Detroit*, 183 Mich. App. 334, 340 (1990) ("It is well established that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation.").

Defendants contend that Ivan Pillars is entitled to summary judgment because Volunteer has abandoned its tortious interference claim against him. This contention is without merit. Volunteer's failure to move for summary judgment on its tortious inference claim against Ivan Pillars does not evidence an intent to abandon its claim against Pillars.

In its cross-motion, Volunteer contends that it is entitled to summary judgment on its tortious interference claim against Rockwood because there is no issue of fact that Rockwood intentionally procured the termination of Volunteer's service contracts with its customers by directly soliciting Volunteer's customers and by providing direct orders to Option representatives to transfer accounts from Volunteer to alternative gas suppliers. Whether Rockwood's actions were wrongful depends on the construction of the contractual relationship between Volunteer and Option. For the reasons outlined in section III above,

14

there are questions of fact that preclude a ruling on this claim. Accordingly, the parties' cross-motions for summary judgment on the tortious interference claims will be denied.

**V.**

Option has moved for summary judgment on its counterclaim against Volunteer for failing to pay commissions due. Option's counterclaim alleges that between February 2009 and March 2011, Option solicited a substantial number of customers for Volunteer which remain customers to date, and that despite the Agent Agreement, Volunteer has ceased paying commission as of March 2011. (Dkt. No. 27, Am. Countercl. ¶¶ 10, 12.) Option seeks damages for breach of contract, violation of the Michigan Sales Representative Commission Act ("SRCA"), Mich. Comp. Laws § 600.2961, and unjust enrichment. Option contends that due to Volunteer's admitted willful and intentional refusal to pay, Option is entitled to treble damages and attorney's fees under the SRCA.

Volunteer does not deny that it has failed to pay commissions that are due under the Agent Agreement. Volunteer "admits that, but for Defendants' material breach, they would have been entitled to commission for VESI customers acquired through Defendants' efforts." (Dkt. No. 28, Ans. to Countercl. at ¶ 15.) Volunteer explains that it "has not provided such commission due to Defendants' material breach of the Agreement or in the alternative, is applying its right of off-set against commissions that would otherwise be due and payable to Defendant Option Energy." (*Id.* ¶ 12.) Volunteer acknowledges that but for its exercise of its asserted right of setoff, Option would be entitled to commissions of "approximately

15

$53,000." (Dkt. No. 101, Def. Br. Ex. G, Ans. to Interrog. 10.)

Volunteer contends that it has a common law right of setoff, and that it would be inequitable to require it to pay Option's commissions when Option is liable to Volunteer for more than $500,000 for breach of the Agent Agreement. *See Tworek v. Asset Acceptance, LLC,* No. 09-13373, 2010 WL 707365, at *2 (E.D. Mich. Feb. 23, 2010) ("The right to setoff is a widely recognized common law right which allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'").

Option responds that Volunteer does not have a right of setoff against Option's statutory claim under the SRCA.

The SRCA provides in pertinent part:

(4) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the termination date shall be paid within 45 days after the date on which the commission became due.

(5) A principal who fails to comply with this section is liable to the sales representative for both of the following:

      (a) Actual damages caused by the failure to pay the commissions when due.

      (b) If the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000.00, whichever is less.

(6) If a sales representative brings a cause of action pursuant to this section,

16

the court shall award to the prevailing party reasonable attorney fees and court
costs.

Mich. Comp. Laws § 600.2961(4)-(6).  The SRCA further provides that "[a] provision in a
contract between a principal and a sales representative purporting to waive any right under
this section is void."  Mich. Comp. Laws § 600.2961(8).

The purpose of the SRCA is "to ensure that post-termination commissions are fully
and promptly paid when due." *Muqtadir v. Micro Contacts, Inc.*, 148 F. App'x 348, 352 (6th
Cir. 2005).  The Michigan Court of Appeals has expressly held that a principal cannot reduce
commissions that are due by amounts deemed owing to the principal by the sales
representative. *Peters v. Gunnell, Inc.*, 253 Mich. App. 211, 217-18 (2002) (holding that a
wheelchair manufacturer was not entitled to have the value of unaccounted for show
equipment deducted from commissions that were due and owing a salesperson under SRCA).
"Nothing in the SRCA suggests that it is necessary or proper for a principal to reduce
commissions that are due by the amount of expenses that might later be deemed owed by a
sales representative." *Id.* at 218.

Volunteer contends that the SRCA is not applicable to this case because the Agent
Agreement provides that the agreement will be governed by Ohio law.

Federal courts sitting in diversity must apply the choice of law principles of the forum.
*Klaxon Co. v. Stentor Electric Manufacturing Company*, 313 U.S. 487 (1941).  Accordingly,
Michigan choice-of-law principles apply to this case.  Under Michigan choice-of-law
principles, the parties' choice of law will be followed unless "(1) the chosen state has no

17

substantial relationship to the parties or the transaction, or (2) there is no reasonable basis for choosing that state's law," or if it would be "contrary to the fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue, and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Martino v. Cottman Transmission Systems, Inc.*, 218 Mich. App. 54, 60-61 (1996) (quoting Restatement (Second) of Conflict of Laws § 187).

In *Howting-Robinson Assoc., Inc. v. Bryan Custom Plastics*, 65 F. Supp. 2d 610, (E.D. Mich. 1999), the court held that the Michigan SRCA applied to the parties' dispute over unpaid commissions despite the fact that the parties' written contract provided that Ohio law governed the parties' business relationship. The court reasoned:

> The text of the MSRA [SCRA] indicates that the Michigan Legislature, in enacting a heavy penalty against violating principals, intended to ensure that sales representatives in Michigan are paid the full commissions to which they are entitled, especially when those commissions fall due after the termination of the employment relationship.

*Howting-Robinson Assoc., Inc. v. Bryan Custom Plastics*, 65 F. Supp. 2d 610, 613 (E.D. Mich. 1999) (citing *Walters v. Bloomfield Hills Furniture*, 228 Mich. App. 160, 577 N.W.2d 206 (1998)). The Michigan Court of Appeals held that because Ohio did not provide the same quality of protection that the Michigan SRCA would provide, application of Ohio law would violate Michigan public policy. *Id.* at 613. The Sixth Circuit appears to have taken a contrary view in *Johnson v. Ventra Group, Inc.*, 191 F.3d 732 (6th Cir. 1999), where it held that "[b]ecause Ontario law governs the instant case, the Michigan statute is inapplicable."

18

*Id.* at 749. However, the *Johnson* case is not particularly instructive because the Sixth Circuit also noted that, because the SRCA was enacted after the plaintiff was terminated, the principal could not have complied with a statute that did not exist at the time of the sales representative's termination. *Id.*

The Court is satisfied that the Michigan SRCA does embody Michigan public policy, and that in light of the fact that the Agent Agreement was negotiated and made in Michigan and covered services that a Michigan sales representative was to perform exclusively in Michigan, failing to offer the protections of the SRCA would violate Michigan public policy. However, after *Howting-Robinson* and *Johnson* were decided, Ohio enacted a statute that provides for relief comparable to the SRCA. *See* Ohio Rev. Code § 1335.11 (effective Oct. 29, 1999). In light of the comparable Ohio statute, application of Ohio law would not be contrary to Michigan public policy. Accordingly, any action for commissions owed under the contract must be predicated on Ohio law in accordance with the parties' choice of governing law in the Agent Agreement.

For the reasons stated, Option's motion for summary judgment on its counterclaim will be denied, but Option will be granted leave to amend its counterclaim to assert a claim under the comparable Ohio statute.

An order consistent with this opinion will be entered.

Dated: <u>August 16, 2012</u>                    <u>/s/ Robert Holmes Bell</u>
                                                ROBERT HOLMES BELL
                                                UNITED STATES DISTRICT JUDGE