UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VOLUNTEER ENERGY SERVICES, INC.,

       Plaintiff,

                                      File No.  1:11-CV-554

v.

                                      HON. ROBERT HOLMES BELL

OPTION ENERGY, LLC, et al.,

       Defendants.

_____/

## O P I N I O N

This action between Plaintiff Volunteer Energy ("Volunteer" or "VESI"), and Defendant Option Energy, LLC ("Option") came before the Court for a bench trial on September 17, 2012.  The Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

### I. Background

On February 2, 2009, Option and Volunteer entered into an Agent Agreement.  Under the Agreement, Option agreed to be an agent for Volunteer and to "exert its best efforts to promote the sale of natural gas by Volunteer to new customers in the Territory."  (Agent Agr. § 4(a).)  In return, Volunteer agreed to pay Option a commission for as long as Volunteer supplies natural gas to Agent Customers.  (Agent Agr. § 3.)  During the life of the contract, Volunteer learned that Option was soliciting Volunteer customers originally signed by Option and transferring them to another supplier.  Volunteer responded by withholding Option's

commissions.  By letter dated April 1, 2011, Option terminated the Agent Agreement, effective April 21, 2011, based on its assertion that Volunteer had breached the Agreement by, among other things, failing to pay commissions and failing to provide rates and marketing materials.  (Dkt. No. 100, Ex. F.)

On May 27, 2011, Volunteer filed this action for breach of contract against Option (Count I) and tortious interference with a business relationship against Option, Rockwood, and Ivan Pillars[1] (Counts II, III, IV) based on Defendants' solicitation of Volunteer customer accounts for a competitor.  (Dkt. No. 10, Am. Compl.) Volunteer filed a counterclaim alleging breach of contract, violation of the sales representative commission law, and unjust enrichment based on Volunteer's failure to pay commissions as they came due.  (Dkt. No. 27, Countercl.; Dkt. No. 130, Am. Countercl.)

In cross-motions for summary judgment, Volunteer argued that the non-solicitation provision prohibited Option from soliciting Volunteer customers during the term of the Agreement and for one year thereafter.  Defendants argued that the non-solicitation provision only prohibited Option from soliciting Volunteer customers after termination of the Agent Agreement.  This Court determined that it was unclear from the language of the Agreement whether the non-solicitation provision applied during the life of the Agreement, or whether it only came into effect upon termination of the Agreement.  (Dkt. No. 128, Op. 6-7.)   The Court determined that there was a question of fact for trial as to whether there was a meeting

---

[1]Pillars was dismissed on stipulation of the parties.  (Dkt. No. 143, Stip.)

of the minds with respect to when the non-solicitation provision was to take effect.  (*Id.* at 8.)

At the bench trial on September 17, 2012, the parties presented the testimony of Shawn Hall and Jonathan Rockwood regarding the intention of the parties when they entered into the Agreement.  The Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

## II.  Findings of Fact

Volunteer is an alternative natural gas supplier in the State of Michigan.  An alternative gas supplier buys gas on the wholesale market and resells it to retail customers.  Volunteer has been a licensed alternative natural gas supplier since 2006.  Shawn Hall has worked for Volunteer for six years.  His duties include responsibility for hiring agents.

Defendant Option Energy is an Ohio limited liability company formed in 2008 to broker alternative energy.  Jonathan Rockwood is its sole owner, president, and Chief executive officer.

On February 2, 2009, Hall met with Rockwood at Option's offices in Kalamazoo in response to Rockwood's inquiry about working with Volunteer.  Rockwood explained that Option was a brokerage firm that called on commercial customers, and that it would be able to bring a commercial volume to its suppliers.  Rockwood further explained that Option was already working as a broker for other gas suppliers, and that it would continue to work for other suppliers while working for Volunteer.  Hall did not object.  Hall determined that

3

Rockwood would be a good fit for Volunteer and offered him the opportunity to enter into an Agent Agreement.

The Agent Agreement provided that the Agent would "exert its best efforts to promote the sale of natural gas by Volunteer to new customers in the Territory." (Agent Agr. § 4(a).) In return, Volunteer agreed to pay the Agent a commission of 10 cents per mcf[2] for as long as Volunteer supplies natural gas to Agent Customers.[3] (Agent Agr. § 3.) The Agent's rights to solicit customers are non-exclusive, "it being expressly understood that VESI, in its sole discretion, shall have the right to employ sales representatives and/or enter into independent contractor agreements with others in the Territory." (Agent Agr. § 2(b).) The Agent Agreement permitted either party to terminate the agreement on 60 days prior written notice, or immediately if either party was in material default and failed to cure the default within 20 days after receiving written notice. (Agent Agr. § 9.)

The Agent Agreement contains a Non-Solicitation/Non-Competition clause which provides in pertinent part:

> **For the term of this Agreement and** for the longer of (a) **one year after the Termination Date** (defined below) or (b) to Agent following termination, as set forth in Section 10, **Agent agrees that it will not** (1) employ any VESI employee without VESI's prior written consent or solicit or attempt to induce

---

[2]At some point during the life of the contract Volunteer increased Option's commission rate from 10 to 15 cents per mcf.

[3]This Court previously determined that the term "Agent Customers" refers to Volunteer customers that were solicited by Option, and that the non-solicitation clause's prohibition against Agents soliciting "customers" applies to all customers of Volunteer, including Agent Customers. (Dkt. No. 128, Op. 9-10.)

any VESI employee to become its employee or the employee of any VESI competitor or customer; and/or (2) **solicit existing customers at the time of the termination date of VESI** (including those of VESI's affiliates) in the Territory regarding the purchase of natural gas by any such customer.

(Agent Agr. § 8 (emphasis added).)

After reviewing the Agreement, Rockwood had some questions for Hall about the commission rate of $.10 per mcf. Rockwood and Hall did not discuss the meaning of paragraph 8, entitled Non-Solicitation/Non-Competition. Their only discussion regarding paragraph 8 concerned commissions. Hall assured Rockwood that if the Agreement was terminated, Option would still be paid commissions. There was no discussion about the status of customers Option brought in, and Rockwood never asserted that his loyalties would be to the customers rather than to Volunteer. The Agent Agreement was signed by Hall on behalf of Volunteer, and by Rockwood on behalf of Option.

At trial, Rockwood testified that it was his understanding that during term of Option's contract with Volunteer, it could switch any customer Option brought in to Volunteer to any other alternative gas supplier. As evidence of this understanding, Rockwood testified that from the beginning of Option's relationship with Volunteer in 2009, Option began switching customers on a regular basis from Volunteer to other alternative energy suppliers without asking permission to do so.

Rockwood did not produce any documentary evidence to support his assertion that he regularly switched customers from Volunteer to other alternative gas suppliers from the beginning of the Agreement, and the evidence that was produced tends to contradict his

5

assertion.  Rockwood could not name any customers he switched in 2009.  Moreover, because he testified at his deposition that the only company he transferred customers to was Integrys, (Dkt. No. 100, Ex. 2, Rockwood Dep. 21), and because Option did not enter into an agent agreement with Integrys until 2010, it does not appear that Option transferred any Volunteer customers prior to 2010.

Hall testified that the non-solicitation provision meant that Option was not allowed to switch Volunteer customers during the life of the Agreement or for 12 months after termination of the Agreement.  During the course of the contract, Hall became aware that Option was moving accounts without authorization.  Hall reminded Rockwood on numerous occasions that he was not authorized to switch customers.  Rockwood's responses tend to confirm that he shared Hall's interpretation of the non-solicitation provision, and tend to refute Rockwood's testimony that he believed the contract permitted him to transfer customers away from Volunteer.

On March 26, 2010, Hall sent an email to Rockwood advising that he "[j]ust got a call from another customer that Option signed and Option is try[sic] to switch." (Ex. 3.)  Hall attached a copy of the non-solicitation provision to the email.  Hall testified that the purpose of the email was to let Rockwood know he was in violation of his Agent Agreement.  Rockwood did not express any disagreement with Hall's email or with Hall's interpretation of the contract.  Rockwood did not raise any of the arguments he raised at trial.  He did not say that the non-solicitation provision did not apply to Agent customers.  He did not say that

the non-solicitation provision did not apply until the contract was terminated.  He did not say that he had been switching customers from the beginning of the contract.  Instead, Rockwood forwarded Hall's email to Charles Schmiege, one of his sales agents. (Ex. 3.)  Rockwood testified that he never told Schmiege that he was not allowed to transfer customers from Volunteer.  However, he clearly implied as much when he forwarded Hall's email to Schmiege.  Rockwood also assured Hall that he had spoken to his agents and informed them that they should not switch customers from Volunteer, but his agents did not always listen to him.

Rockwood acknowledged that before April 2010, Hall had sent several emails saying Option could not switch customers.  Rockwood never objected orally or in writing to any of Hall's representations regarding the contract's provision on switching customers.

On April 7, 2010, Henry McDaniel, Option's Data and Records Administrator, assured Schmiege that it was acceptable to sign an account with Integrys: "It never was Volunteer's so it should be no problem signing them with Integrys."  (Ex. 8 , 4/7/10 email from McDaniel to Schmiege.)  This email similarly implies an understanding on the part of another of Rockwood's employees that Schmiege was not permitted to transfer a Volunteer customer to Integrys.

Hall testified that on April 9, 2010, Rockwood contacted him to request permission to switch eight or nine customers to another supplier that offered a fixed rate contract that was not offered by Volunteer.  Hall approved the transfer of 12 accounts, but advised that

anything beyond 12 would be a violation of the Agent Agreement.  Rockwood did not object to this limitation.  Rather, he expressed his appreciation for Volunteer's willingness to work with him.

At trial, Rockwood denied that he requested permission to switch the customers to a fixed rate supplier.   He testified that he only informed Hall of his plans as a courtesy and to keep good relations.  Rockwood's characterization of his purpose for contacting Hall is not credible.  Hall's April 13, 2010, email references Rockwood's request for permission to switch customers.  (Ex. 4).   Rockwood never objected to that email's characterization of their conversation.  The Court finds, contrary to Rockwood's testimony, that Rockwood did request permission to transfer accounts.  Rockwood's request for permission, coupled with his failure to object to a limitation on transfers, refutes Rockwood's contention that he believed he had authority to switch customers under the Agreement and that he had been doing so regularly.

An August 3, 2010, email from McDaniel, Option's Data and Records Administrator to Anna Simonian, an Option agent, states: "These accounts were Never Received by Volunteer.  We can submit them with either Volunteer or Integrys."  (Ex. 5.)  This exhibit suggests that it was Option's understanding, and Option's instructions to its agents, that it was permissible to switch the accounts only because they had never been enrolled by Volunteer.  The email implies that if Volunteer had signed these customers, it would not be permissible to switch them.

8

On August 24, 2010, Hall sent an email to Rockwood regarding yet another violation of the Agent Agreement for transferring customers:

> I got a call from a rep who spoke with Mona Cleaners in GR the customer said Charles [Schmiege] recently switched them from VESI, to Integrys. According to the customer Charles told them that they could switch back to VESI later (why switch them now) Customer said Charles called the customer and talked him into switching after the owner told him he was happy with VESI.

(Ex. 6, 8/24/10 email from Hall to Rockwood.)  Rockwood did not respond in writing to this email.  He did, however, have a conversation with Hall, and asked Hall if he was sure it was Option that was switching customers, since he had already spoken to his agents.

On September 2, 2010, one of Option's agents, Schmiege, sent an email to Anne Liggett, a Volunteer customer, about switching her company from Volunteer to Integrys. Schmiege advised Liggett that "Option Energy's agreement with the supplier Volunteer, states we (OE) should not steer former (Volunteer) clients away to other suppliers."  (Ex. 7, 9/2/10 email from Schmiege to Liggett.)  In light of that agreement, Schmiege requested Liggett to type a short letter explaining that she approached Option about obtaining better pricing.  Option would keep the letter in its files, "should Volunteer complain to Option Energy, that we are recommending to clients to leave Volunteer."  (*Id.*)  Rockwood's testimony that he never told  Schmiege he could not transfer customers away from Volunteer is not credible because there was no explanation as to how Schmiege would have obtained this information other than from Rockwood or from one of Rockwood's employees.

Throughout 2010, Option's relationship with Volunteer worsened.  Volunteer's lack

9

of a fixed rate contract made it difficult for Option to compete with other suppliers. Volunteer was not providing Option information about its pricing, so Option could not communicate the current price to potential customers. Option submitted enrollments to Volunteer, but Volunteer lost many of them, and new enrollments were not reflected on Option's commission report. At one point during the life of the contract, a comparison between Option's list of customers and Volunteer's list of customers disclosed 105 accounts that were not enrolled by Volunteer. When customers signed by Option on behalf of Volunteer were not switched over to Volunteer, they brought their complaints to Option, and Volunteer did not contact these customers to smooth things over with them. Given these difficulties, Rockwood was frustrated when Volunteer refused to increase the commission rate to 20 cents per mcf unless Option increased its accounts from 1200 to 2000.

Hall acknowledged that there were problems in Volunteer's relationship with Option but denied that Volunteer was responsible for all of them. Some of the problems were attributable to Option's failure to provide information to Volunteer, Option's failure to provide accurate account information or utility numbers, or customers being in arrears and being ineligible to enroll. Whatever the cause of the problems, the Court finds that Option had legitimate frustrations with Volunteer's lack of communication and professionalism.

Rockwood testified that his remedy was to find a supplier that would meet Option's needs by enrolling the customers in a timely fashion, and paying Option its commissions in a timely fashion. After Hall gave Rockwood permission to transfer no more than 12

10

Volunteer customers in April 2010, more accounts were transferred.  When Hall confronted Rockwood, Rockwood said that he did not mean to transfer accounts.  Rockwood told Hall that the transfers were accidents by his agents and that they did not reflect his method of operating his business.  Rockwood advised Hall that he would instruct his agents again not to switch Volunteer customers to other suppliers.

However, Option did continue to transfer customers and increased the rate at which it was making those transfers.  Volunteer serves approximately 60,000 customers.  Volunteer was not immediately aware of Option's transfers.  Although Volunteer's records reflect when a customer is switched from Volunteer to another supplier, the records do not indicate who the customer switched to or what broker was responsible for switching the account.  Accordingly, Volunteer was not immediately aware when Option was switching customers from Volunteer to Integrys until it undertook further investigation.  As of February 25, 2011, the number of Volunteer customers switched by Option increased from 103 to 210 in 60 days.  (Ex. 21, VESI 0000022.)  The next week, Option switched an additional 41 accounts.  (Ex. 21, VESI 0000006.)  As of March 15, 2011, Option moved 16 more accounts for a total of 267 accounts moved.  (Ex. 21, VESI 0000060.)

At some point before the termination of the Agent Agreement, Hall met with Bells Brewery, one of Volunteer's customers.  Bells Brewery asked Hall why Rockwood was trying to switch Bells Brewery to a different supplier.   Hall then met with Rockwood and Pillars and told them that he had heard that Option was trying to switch Bells Brewery away

11

from Volunteer. Rockwood responded with anger to this accusation. He said it might not be Option that was trying to switch Bells Brewery, as there were other brokers competing for business. When Hall disclosed that he knew it was Rockwood himself who had called on Bells Brewery, Rockwood responded that he had only called on Bells Brewery for the purpose of obtaining information, and not to switch them to a different supplier. Rockwood's belated explanation was not credible.

Volunteer ceased paying Option its commissions as of March 2011. (Ex. B, 2/25/2011 email from Madden to Anderson; Ex. 19, Rockwood Aff. § 18.) By letter dated April 1, 2011, Option terminated the Agent Agreement effective April 21, 2011. (Ex. 2.) Option asserted that Volunteer was in default under the Agent Agreement by, among other things, failing to pay commissions, failing to provide rates and marketing materials, and failing to provide reports of cancellations, drops or errors.

After the Agent Agreement was terminated, Option continued to switch customers from Volunteer to Integrys. At trial Rockwood denied telling Simonian to switch customers after the termination of the Agreement. This testimony was not credible. On April 25, 2011, four days after the termination of the Agreement, Simonian sent Rockwood an email stating: "Please let me know what you want me to say to all my Volunteer customers you want me to switch over to Integrys." (Ex. 11, 4/25/11 email from Simonian to Rockwood.) Rockwood sent three additional emails the next day to other agents, telling them to switch the attached list of Volunteer customers over to Integrys. (Exs. 12-14, 4/26/11 emails from

12

Rockwood to Allen, Strong, and Gonzalez.)

Rockwood's testimony on the issue of his understanding of the contract was not credible. Much of Rockwood's testimony at trial was evasive. Rockwood took too much time answering easy questions, he denied knowledge of matters he clearly had knowledge of, and he changed his testimony when he was caught in inconsistencies. In his April 5, 2011, affidavit, Rockwood stated that "at no time has Option Energy contacted or solicited any person for the express purpose of convincing that person to cease doing business with Volunteer." (Ex. 19, Rockwood Aff. § 17.) This statement is directly contradicted by Rockwood's testimony and other evidence at trial that Option solicited many Volunteer customers for the express purpose of transferring them to Integrys. Rockwood repeatedly lied to Volunteer, and he lied to the Court.

Most importantly, Rockwood's testimony regarding his interpretation of the non-solicitation provision was not consistent with his conduct during the life of the contract. The evidence reveals that Rockwood was not afraid to confront Hall. Rockwood raised numerous issues with Hall during the life of the contract such as lack of communication, failure to enroll customers, failure to provide pricing information. However, Rockwood never once contested Hall's frequent assertions that the contract did not permit Option to switch Agent customers from Volunteer to another alternative energy supplier. At no time before the filing of this lawsuit did Rockwood ever tell Hall that it was his opinion that he could switch customers. Rockwood's assertion that he understood he was authorized to move Volunteer

13

customers during the life of the Agreement is belied by his failure to raise this issue during the life of the Agreement, his failure to deny Hall's assertions that he was not permitted to move customers, his emails to his employees, and his employees' representations.

The Court concludes that Rockwood's understanding of the non-solicitation provision was identical to Hall's understanding of the non-solicitation provision. They both understood that the Agreement prohibited Option from transferring Volunteer customers to other alternative gas suppliers during the life of the contract. Volunteer objected to Option's solicitation of Volunteer customers as soon as it became aware of Option's actions and throughout the term of the Agent Agreement. Option switched customers, not because Rockwood believed that the Agreement permitted it, but because Rockwood was not satisfied with other aspects of Option's relationship with Volunteer, including Volunteer's failure to promptly and efficiently enroll customers Option brought in, Volunteer's failure to communicate pricing information, Volunteer's failure to offer a fixed rate program, Volunteer's failure to pay commissions on a timely basis, Volunteer's failure to offer a higher commission rate, and Volunteer's failure to offer a contract more similar to Option's contract with Integrys, which specified that Option could place the interest of its customers before those of the supplier.

Option suggests that Volunteer's failure to terminate the contract when it became aware that Option was transferring accounts is evidence that Volunteer understood that the contract did not preclude Option from soliciting Volunteer customers during the life of the

14

contract.  Option also suggests that Volunteer was somehow responsible for its damages because it allowed Option to continue to switch customers.  The Court does not agree.  The evidence reflects that Hall confronted Rockwood when he discovered that accounts were being transferred.  On each occasion, Rockwood assured Hall that those were accidents.  Rockwood was the one who lulled Volunteer into continuing the contract.  Volunteer's failure to terminate the contract earlier is not evidence that it did not believe that Option's transfer of clients was a breach of the non-solicitation provision.

At the time he executed the Agent Agreement and thereafter, Rockwood understood that the non-solicitation provision prohibited the solicitation of Volunteer customers during the life of the contract and for one year after the termination of the contract.  Notwithstanding this prohibition, Option transferred many Volunteer customers to Integrys.

Option's transfer of customers from Volunteer to Integrys resulted in a loss of profits to Volunteer.  The lost profits were calculated based on the transferred customers' historical usage.  The annual load of the accounts switched to Integrys was approximately 485,000 mcf.  From the selling price, Volunteer deducted various expenses for transportation costs and shrinkage.  Volunteer's standard profit margin is $1.20 per mcf.  After subtracting $.15 per mcf for commissions, Volunteer incurred losses of $509,000 as a result of Option's transfer of Option accounts to Integrys.

Volunteer also claims that Option solicited and transferred the Sundance account to Integrys, which caused Volunteer an additional loss of net income in excess of $53,500.  The

evidence regarding the Sundance account was not clear. The evidence reveals that Layton, not Option, signed Sundance with Volunteer. Sometime thereafter, Layton began working for Option and contacted Sundance for purposes of offering electrical service from Integrys. It is not clear from the evidence whether Layton was working for Option when the Sundance gas account was transferred to Integrys in June 2010, and it is not clear whether Sundance transferred its gas account as a result of solicitation, or simply as an independent choice to have both its electric and gas accounts with one provider. The Court does not find from a preponderance of the evidence that Option solicited Sundance in violation of the Agent Agreement.

Under the Agent Agreement, commissions were the agent's sole and exclusive consideration and compensation. (Agent Agr. § 3.) Option earned commissions by soliciting new customers on behalf of Volunteer. The Agreement provided that Volunteer would provide Option with a monthly statement showing the commissions earned. (Agent Agr. § 3(b).) Commissions continued to be due after termination of the contract. (Agent Agr. § 10.) As of March 2011, Volunteer began withholding commissions from Option. Volunteer has acknowledged that customers signed by Option that have remained with Volunteer have consumed approximately 3,304,000 mcf of natural gas, and that, but for Volunteer's exercise of its asserted right of setoff, Option would be entitled to commissions of approximately $53,000.

16

### III.  Conclusions of Law

The Agent Agreement provides that it will be governed by and construed in accordance with Ohio law.  Under Ohio law, the party alleging breach of contract has the burden of proving by a preponderance of the evidence: (1) existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) resulting damage to the plaintiff.  *Winner Bros., L.L.C. v. Seitz Elec., Inc.*, 912 N.E.2d 1180, 1187 (Ohio Ct. App. 2009); *Prey v. Kruse*, No. 2:08-cv-287, 2010 WL 1257612, at *4 (S.D. Ohio Mar. 29, 2010). "[W]here a contract is ambiguous, parol evidence may be employed to resolve the ambiguity and ascertain the intention of the parties."  *Ill. Controls, Inc. v. Langham*, 639 N.E.2d 771, 779 (Ohio 1994).

Because the Agent Agreement was poorly drafted, a trial was necessary to ascertain the intent of the parties when the contract was entered into.[4]  The parties did enter into a contract which included a non-solicitation provision which the parties mutual understood prevented Option from soliciting Volunteer customers during the life of the contract and for one year after the termination of the contract.  Option breached the Agent Agreement by soliciting Volunteer customers and switching them to Integrys, a competing alternative natural gas supplier, during the life of the Agent Agreement and within one year after the termination of the contract.  Volunteer suffered damages in the amount of $509,000 as a

---

[4]Had the contract been clearer, this trial, and perhaps even the lawsuit, would not have been necessary because the attorneys would have been able ascertain the likely outcome of this case.

17

result of Option's breach.  Judgment will be entered in favor of Volunteer on its breach of

contract claim in the amount of $509,000.

Volunteer has also alleged a claim against Rockwood individually for tortious

interference with a business relationship.  Volunteer alleges that Rockwood tortiously

directed his agents to violate the non-solicitation provision and to interfere with Volunteer's

relationship with its customers.

Under Michigan law, a claim of tortious interference with business relationship

requires:

> (1) a valid business relationship or expectancy; (2) knowledge of that
> relationship or expectancy on the part of the defendant; (3) an intentional
> interference by the defendant inducing or causing a breach or termination of
> that relationship or expectancy; and (4) resulting damage to the plaintiff.

*Warrior Sports, Inc. v. NCAA*, 623 F.3d 281, 286 (6th Cir. 2010) (citing *Via The Web*

*Designs, L.L.C. v. Beauticontrol Cosmetics, Inc.*, 148 F. App'x 483, 487 (6th Cir. 2005)).

"'The third element of this tort requires the plaintiff to demonstrate . . . an intentional act

that is either (1) wrongful per se; or (2) lawful, but done with malice and unjustified in

law.'" *Id*. (quoting *Via The Web Designs*, 148 F. App'x at 487).  "Where the defendant's

actions were motivated by legitimate business reasons, its actions would not constitute

improper motive or interference." *Erickson's Flooring & Supply Co., Inc. v. Tembec, Inc.*,

212 F. App'x 558, 566 (6th Cir. 2007) (quoting *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586,

597-98 (2003)).  A corporate officer or agent may be held personally liable for the torts

committed by him even though he was acting for the benefit of the corporation.  *See*

*Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.,* 821 F. Supp. 1201, 1213 (E.D. Mich. 1993) (citing authorities).

The evidence does not support a finding of tortious interference with business relations.  Plaintiff has shown nothing more than a breach of contract by the corporation, not a separate tort of tortious interference.  Judgment will be entered in favor of Rockwood on Volunteer's tortious interference claim.

Ohio law requires a principal to pay commissions to sales representatives on a timely basis.  Ohio Rev. Code § 1335.11.  Option was a "sales representative" within the meaning of this statute.  Upon termination of a contract,

> the principal shall pay the sales representative all commissions due the sales representative at the time of the termination within thirty days of the termination and shall pay the sales representative all commissions that become due after the termination within thirteen days of the date on which the commissions become due.

*Id.* at § 1335.11(C).  A principal who fails to comply with timely payment of commissions after termination of a contract may be liable for exemplary damages as follows:

> (D) A principal who fails to comply with division (C) of this section or with any contractual provision concerning timely payment of commissions due upon termination of a contract with a sales representative is liable in a civil action for exemplary damages in an amount not to exceed three times the amount of the commissions owed to the sales representative if the sales representative proves that the principal's failure to comply with division (C) of this section or the contractual provision constituted willful, wanton, or reckless misconduct or bad faith.  If a principal receives a written demand for payment of the commissions owed to a sales representative that was sent by certified mail, the failure of the principal to respond to the written demand in writing within twenty days after the principal receives the written demand shall raise a presumption that the principal acted willfully and in bad faith.

> The prevailing party in an action brought under this section is entitled to reasonable attorney's fees and court costs.

*Id.* at § 1335.11(D).

Volunteer violated the Ohio Sales Representative Commission Act, Ohio Rev. Code § 1335.11, by failing to pay Option its commissions as they became due.  Volunteer did not dispute that Option had earned the commissions.   Volunteer's decision to withhold commissions was willful.  Volunteer's duty to timely pay commissions was not excused by Option's violation of the non-solicitation provision, or by a common-law right of set-off.  Although the Court is aware of no Ohio cases addressing a right of set-off under the Sales Commission Act, a right of set-off would not be consistent with the statutory requirement that the principal pay "all commissions due" within a strict time frame, or face liability for exemplary damages.  Moreover, cases interpreting the parallel Michigan statute, the Sales Representative Commission Act ("SRCA"), Mich. Comp. Laws § 600.2961, have expressly held that a principal cannot reduce commissions that are due by amounts deemed owing to the principal by the sales representative.[5]  *See Peters v. Gunnell, Inc.*, 253 Mich. App. 211, 217-18 (2002) (holding that a wheelchair manufacturer was not entitled to have the value of unaccounted-for show equipment deducted from commissions that were due and owing a salesperson under SRCA).  "Nothing in the SRCA suggests that it is necessary or proper for a principal to reduce commissions that are due by the amount of expenses that might

---

[5]The SRCA, like the Ohio statute, provides for treble damages for the intentional failure to pay a commission when due.   *Id.* at § 600.2961(4)-(5).

later be deemed owed by a sales representative." *Id.* at 218. The Court concludes that Option is entitled to treble damages for Volunteer's willful withholding of commissions due after termination. The Court will accordingly enter judgment in favor of Option on its counterclaim against Volunteer for failing to pay commissions due in the amount of $159,000, together with reasonable attorney's fees and court costs incurred in bringing this counterclaim.

A judgment consistent with this opinion will be entered.

Dated: December 6, 2012          /s/ Robert Holmes Bell
                                 ROBERT HOLMES BELL
                                 UNITED STATES DISTRICT JUDGE